UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Land & Resource Consulting, Inc., | No. 25-cv-2890 (KMM/SGE) |
| Plaintiff, | |
| v. | **ORDER** |
| Work Horse Land Development, LLC, and William Webber, | |
| Defendants. | |

Plaintiff Land & Resource Consulting, Inc. ("LRC") filed this action against Defendant Work Horse Land Development, LLC ("Work Horse").[1] Work Horse answered and filed several counterclaims. After LRC moved to dismiss the counterclaims, Work Horse filed an Amended Counterclaim alleging that LRC breached several contracts, tortiously interfered with Work Horse's existing contractual relationships with third parties, and fraudulently induced Work Horse to enter contracts with LRC. This matter is before the Court on LRC's motion to dismiss Work Horse's Amended Counterclaims. For the reasons discussed below, LRC's motion is denied in part and granted in part.

BACKGROUND

*Plaintiff's Complaint*

Although the legal sufficiency of LRC's claims against Work Horse are not before the Court, some context with respect to LRC's Complaint is useful. LRC alleges that Work

---

[1] Defendant William Webber, the principal of Work Horse, was also named in the Complaint.

1

Horse failed to pay for engineering services LRC provided pursuant to the parties' contracts for six different real estate development projects. These projects include:

1. A residential development on Ridge Road in Le Sueur County, Minnesota ("the Le Sueur Project");

2. A mixed-use development on Old Fon Du Lac Road in Kewaskum, Wisconsin ("the Kewaskum Project");

3. A mixed-use residential development in Hutchison, Minnesota ("the Hutchison Project");

4. A mixed-use residential development in Ellsworth, Wisconsin ("the Ellsworth Project");

5. A mixed-use residential development in Young America Township, Minnesota ("the Young America Project"); and

6. A mixed-use development on Albers Avenue in Faribault, Minnesota ("the Faribault Project").

LRC agreed to provide conceptual sketch plans; topographic boundary surveys; preliminary plat and preliminary construction plans; wetland delineations; geotechnical surveys; tree surveys; storm water management design; entitlement application for approval processes; construction documentation; final plats; project management; and construction administration. According to LRC, the total contractual value of the work it agreed to perform for these six projects was over $1.7 million. However, Work Horse allegedly still owes LRC over $400,000 for work LRC performed on these projects. LRC seeks compensatory damages and other relief in its complaint.[2]

---

[2] LRC also claims that Defendants fraudulently induced LRC to enter into the six contracts at issue in LRC's complaint. According to LRC, Work Horse and its principal, Defendant William Webber, never had any intention to honor its contractual responsibility to pay if any project turned out not to be sufficiently profitable.

*Defendants' Counterclaims*

**Breach of Contract.** Work Horse asserts nine breach-of-contract claims against LRC. (Dkt. 28.) These include the same six projects listed above and three others: (1) an initial project in Princeton, Minnesota ("the Princeton I Project"); (2) a second project in Princeton ("the Princeton II Project"); and (3) a project in Hot Springs, Arkansas ("the Hot Springs Project").

Work Horse alleges that LRC breached all nine agreements. For example, Work Horse alleges that "LRC materially breached the Le Sueur Contract by[:] missing timelines and deadlines; providing incomplete cost estimates that failed to include stormwater costs in budgeting; and failing to communicate and preform the services under the Le Sueur Contract." (*Id.* ¶ 29.) LRC also allegedly breached the Le Sueur contract "by failing to maintain accurate accounting records and other project related records." (*Id.* ¶ 30.) LRC's breaches allegedly caused the builder for the Le Sueur Project to refuse to move forward and Work Horse was forced to sell the Le Sueur Project at a substantial loss. (*Id.* ¶ 32.) Work Horse claims to have lost an expected $3.5 million in profit on the Le Sueur Project. (*Id.* ¶ 33.) Work Horse also says that it has been damaged because it had to pay LRC's subcontractors directly when LRC failed to pay them and was forced to incur the time and

expense of completing "Mylar filings" that LRC was contractually obligated to complete. (*Id.* ¶¶ 34–35.)[3]

Relevant to the pending motion to dismiss, each of the agreements contains the following notice provision:

> **NOTICE OF CLAIMED ERRORS OR OMISSIONS.** In consideration of Consultant's providing insurance to cover claims made by Client, Client hereby waives offset as to fees otherwise due to Consultant. Client shall provide written notice, including all know [sic] associated details, to Consultant of any claimed errors or omissions in Consultant's services no later than 60 calendar days after Client becomes aware, or in the exercise of reasonable diligence should have become aware, of the existence of such error or omission. Consultant shall be given a reasonable opportunity to investigate to investigate solutions to mitigating alleged damages. Client's failure to provide such notice, and/or Client's failure to provide Consultant a reasonable opportunity to investigate and offer solutions, within the time stated shall constitute an irrevocable waiver of any and all claims, counterclaims, defenses, setoffs, or recoupments in connection with any such alleged error or omission.

(Dkt. 39-3 at 11.)[4] In its Amended Counterclaim, Work Horse alleges that it provided written notice to LRC of violations of the contract that form the basis of Work Horse's breach-of-contract claims. It says it gave this notice within 60 calendar days of becoming

---

[3] Work Horse's breach-of-contract claims regarding the other projects are similar to those concerning the Le Sueur Project. (Dkt. 28 ¶¶ 54–56 (Kewaskum Project), 76–77 (Hutchison Project), 100–01 (Ellsworth Project), 122–23 (Young America Project), 143–44 (Faribault Project), 165–66 (Princeton I Project), 185–86 (Princeton II Project), 202–03 (Hot Springs Project).)

[4] Unless otherwise noted, all page numbers refer to the CM/ECF pagination.

4

aware of the LRC's errors and omissions. (Dkt. 28 ¶¶ 31, 57, 78, 102, 124, 145, 167, 187, 204.)

**Tortious Interference.** Work Horse alleges that LRC tortiously interfered with Work Horse's existing contracts with several non-parties. Work Horse states that it had contractual relationships with buyers, sellers, subcontractors and builders. These third parties include: (1) Northwest Asphalt; (2) the City of Ellsworth; (3) Haugo Geotechnical; (4) Heartland Eco Group; (5) Jacobson Environmental; (6) Kjolhaug Enviro Services; (7) Parish Survey & Engineering; (8) SRF Consulting; (9) Bogart, Pederson & Associates; (10) First Class Builders; (11) Diana Stephan and Kathleen Weinand; (12) Randy G Anderson Crown Property of MN, LLC; and (13) Fieldstone. (Dkt. 28 ¶ 210.) LRC allegedly knew of these agreements and provided services "for certain of the relationships." (*Id.* ¶ 211.) According to the Amended Counterclaim, LRC had access to Work Horse's information and systems and was involved in strategic decision-making regarding project timing and completion. (*Id.* ¶ 210.) "When the relationship between Work Horse and LRC soured, LRC took actions to procure the breach of the contractual relationships that Work Horse had with" these third parties. (*Id.* ¶ 211.)

**Fraudulent Inducement.** Finally, Work Horse claims that LRC fraudulently induced Work Horse to enter each of the nine contracts at issue the Amended Counterclaim. For example, Work Horse alleges that before the contract for the Le Sueur Project was executed, LRC "falsely represented to Work Horse that it would fully, timely and accurately complete the terms and conditions of the Le Sueur Contract." (*Id.* ¶ 215.) LRC allegedly knew that this statement was false when it was made and intended that Work Horse would

5

rely on the statement to enter the contract. (*Id.* ¶¶ 216–17.) Work Horse makes essentially the same allegations with respect to the remaining eight projects. (*Id.* ¶¶ 219–51.) Work Horse seeks damages, attorneys' fees, and other financial remedies.

## DISCUSSION

I.  **Legal Standard**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## II.  Breach of Contract

Under Minnesota law,[5] a party asserting a claim for breach of contract must establish the following elements: (1) the existence of a contract; (2) the plaintiff performed the conditions precedent to the right to demand performance by the defendant; and (3) the defendant breached the agreement. *E.g.*, *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

LRC argues that Work Horse's breach-of-contract claims fail because Work Horse's allegations regarding pre-suit written notice are too conclusory. Thus, LRC challenges the sufficiency of Work Horse's claim that it performed a condition precedent to its breach-of-contract claims.[6] The Court disagrees and finds that Work Horse's pleading satisfies this element of its contract claims.

There is no dispute that all nine agreements contain the same written-notice provision. Those provisions plainly require Work Horse to provide written notice within 60 days of becoming aware of any alleged breach by LRC, and they state that Work Horse's failure to provide such notice constitutes waiver of Work Horse's claims. But with respect to each agreement, Work Horse alleges that it provided written notice within 60 days of

---

[5] Because this case is in federal court on diversity jurisdiction, the Court applies the substantive law of the forum, and the Court notes that the agreements include a Minnesota choice-of-law provision. (*E.g.*, Dkt. 39-3 at 10 ("This Proposal shall be governed by Minnesota law, without regard to conflicts of law principles.").). The parties do not dispute that Minnesota law applies.

[6] *See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 365 (Minn. 2009) ("[P]arties to a contract may expressly agree that written notice of breach is a condition precedent to bringing a breach of contract claim and that the failure to give written notice bars a subsequent claim.").

becoming aware of LRC's errors and omissions that constituted the breach of that contract and that LRC failed to cure the deficiencies. LRC argues that Work Horse's allegations that it provided written notice within 60 days are "wholly conclusory" and that "Work Horse fails to support the conclusion that it complied with the notice-and-cure provisions of the contract with any *facts*." (Dkt. 35 at 8.) But here, LRC conflates two concepts—an allegation of fact and the legal conclusion to be derived from that fact. Whether Work Horse provided written notice within 60 days after it became aware of any error or omission by LRC is a question of fact. Whether any notice Work Horse says it provided constituted compliance with the contracts' notice-and-cure provisions is a legal conclusion that hinges upon the facts. Here, Work Horse plainly alleged the necessary facts to support the inference of compliance with the contractual condition.

      LRC clearly disagrees that Work Horse provided the required notice. (Dkt. 35 at 8–9 (arguing that Work Horse does not allege detailed facts "because they do not exist").) But a motion to dismiss for failure to state a claim is not an opportunity for the Court to assess whether there is evidence to support an allegation in a pleading. LRC is correct that Work Horse's allegations concerning the notice are not overly detailed, but it cites no case holding that a party bringing a breach-of-contract claim is required to do more than what Work Horse did here. The Amended Counterclaim alerts LRC to the fact that Work Horse alleges it provided notice in compliance with the contracts. LRC has all it needs from the pleadings to have notice of the basis for Work Horse's claims, to test those claims in discovery, and to establish a defense on the merits.

Accordingly, the motion to dismiss Work Horse's breach-of-contract claims is denied.

### III. Tortious Interference

"To state a claim for tortious interference with a contract, a party must allege (1) the existence of a contract, (2) the accused's knowledge of the contract, (3) intentional procurement of its breach, (4) the absence of justification, and (5) damages." *Paisley Park Enters., Inc. v. Boxill,* 361 F. Supp. 3d 869, 880 (D. Minn. 2019) (citing *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998)).

LRC raises two concerns with Work Horse's tortious-interference claim. First, LRC argues that Work Horse has failed to allege the existence of any specific contract. The Court finds this argument unpersuasive. The Amended Counterclaim asserts that Work Horse had reached an agreement with thirteen third party buyers, sellers, subcontractors, and builders. It identifies who those third parties are by name. While the pleading does not specify or identify any specific contract by name, the nature of the allegations in the Amended Counterclaim are sufficient to provide LRC with notice of the claims against it. The only case LRC cites in support of its argument is *Paisley Park* (Dkt. 35 at 11), but it is distinguishable. The *Paisley Park* court did not dismiss the defendants' tortious-interference claim because it failed to specify a contract. The court found that the relationships the defendants identified with its business partners were nothing more than "negotiations and preliminary agreements" that could not satisfy the first element of the claim under Minnesota law. 361 F. Supp. 3d at 880 (citing *Bouten v. Richard Miller Homes,*

9

*Inc.*, 321 N.W.2d 895, 900 (Minn. 1982)). Here, by contrast, Work Horse alleges that there were existing contractual relationships with the third parties it identifies.

LRC's second argument is more persuasive. LRC contends that Work Horse's tortious-interference claim should be dismissed because Work Horse "does not state any facts related to *how* LRC interfered with [any contract Work Horse] claims to have had [with] the litany of entities mentioned in the Counterclaim." (Dkt. 35 at 12.) The Court agrees. Because a party asserting a tortious-interference claim often lacks access to "alleged behind-the-scenes actions" taken by the defendant, courts do not require such claims to be supported by "highly specific" allegations. *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 761 (D. Minn. 2022) (quoting *Strategic Energy Concepts, LLC v. Otoka Energy, LLC*, No. 16-cv-463 (MJD/BRT), 2016 WL 7627040, at *11 (D. Minn. Nov. 18, 2016)). But here, Work Horse does not identify *any* conduct that LRC allegedly engaged in. Instead, it provides only a conclusory statement that LRC intentionally procured breaches of at least thirteen separate contracts. As to each contract Work Horse had with the identified third parties, all it alleges is "[w]hen the relationship between Work Horse and LRC soured, LRC took actions to procure the breach of the contractual relationships that Work Horse had" with those third parties. (Dkt. 28 ¶ 211.) The Amended Counterclaim, therefore, fails to allege "facts with sufficient detail to give notice of the conduct [Work Horse] complains about." *Am. Achievement Corp.*, 622 F. Supp. 3d at 761. For this reason, LRC's motion to dismiss the tortious-interference claim is granted and Counterclaim X is dismissed without prejudice.

IV.     **Fraudulent Inducement**

When a party is fraudulently induced to enter a contract, the agreement can be voided. *Kruger v. Lely N. Am., Inc.*, 518 F. Supp. 3d 1281, 1291 (D. Minn. 2021) (citing *MCC Invs. v. Crystal Props.*, 415 N.W.2d 908, 911 (Minn. Ct. App. 1987)). Pleading a fraudulent-inducement claim requires the plaintiff to allege the following elements:

> (1) the defendant made a false representation of fact; (2) the defendant either knew the representation was false or asserted it as his own knowledge without knowing whether it was true or false; (3) the defendant intended the plaintiff to rely on the representation; (4) the plaintiff was induced to act based on the representation; and (5) the false representation proximately caused damage to the plaintiff.

*Id.* (citing *Progressive Techs., Inc. v. Shupe*, No. A04-1110, 2005 WL 832059, at *4 (Minn. Ct. App. Apr. 12, 2005)). Moreover, "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "A claim for fraud in the inducement 'is only different from a common-law fraud claim in that it requires a claim that the fraud contributed to the formation of a contract.'" *OrthoAccel Techs., Inc. v. Devicix, LLC*, No. 15-cv-1503 (DWF/TNL), 2015 WL 4563134, at *3 n.1 (D. Minn. July 29, 2015) (quoting *Target Corp. v. LCH Pavement Consultants, LLC,* No. 12-cv-912, 2013 WL 4400390, at *6 (D. Minn. Aug. 9, 2013)). As such, a party asserting fraud in the inducement of a contract must comply with Rule 9(b)'s particularity requirements. *Id.* at *3. This rule requires greater specificity to provide the party accused of fraud "a higher degree of notice than that required for other claims," so that the accused party can "respond specifically and quickly to the potentially damaging allegations." *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (citation omitted). "To satisfy the

11

particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the [party's] false representations, as well as the details of [its] fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Id.*

Work Horse's fraudulent-inducement claims do not comply with Rule 9(b)'s particularity requirement. Nothing in the Amended Counterclaim identifies the time, place, and content of LRC's alleged false representations. Nor does it allege who made any false representation or when the representations were made. Instead, Work Horse provides only conclusory allegations. It simply states, for each of the nine contracts at issue, that LRC falsely represented to Work Horse that it would fully, timely, and accurately complete the terms and conditions of the relevant contract, and thereby induced Work Horse to enter the relationship. Greater specificity is required to adequately assert a claim based on fraud. Accordingly, LRC's motion to dismiss is granted and Work Horse's fraudulent-inducement claim is dismissed without prejudice.

## ORDER

For the reasons stated above, **IT IS HEREBY ORDERED THAT**

1. Plaintiff's Motion to Dismiss Defendant's Amended Counterclaim (Dkt. 34) is granted in part and denied in part.

2. Defendant's Amended Counterclaims for tortious interference with contract (Counterclaim X) and for fraudulent inducement (Counterclaim XI) are **DISMISSED WITHOUT PREJUDICE**.

3. Plaintiff's Motion is otherwise denied.

Date: February 6, 2026

            *s/Katherine Menendez*
            Katherine Menendez
            United States District Judge